FILED
2021 Jan-06  PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **BILLY JAY CHAMLEE, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO.** |
| **v.** ) | |
| ) | |
| **UNUM GROUP CORPORATION** ) | _____ |
| **f/k/a UNUM PROVIDENT** ) | |
| **CORPORATION; and UNUM LIFE** ) | |
| **INSURANCE COMPANY OF** ) | |
| **AMERICA; and GROUP** ) | |
| **INSURANCE PLAN OF** ) | |
| **BLUESCOPE STEEL NORTH** ) | |
| **AMERICA,** ) | |
| | |
| **Defendants.** | |

## COMPLAINT

Plaintiff, Billy Jay Chamlee, Jr. ("Plaintiff"), brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Unum Group Corporation, f/k/a UnumProvident Corporation and Unum Life Insurance Company of America (collectively "Unum") relating to the provision of ERISA-governed disability benefits under the Group Insurance Plan of BlueScope Steel North America ("the Plan") sponsored by Plaintiff's former employer, BlueScope Steel North America ("BlueScope Steel"). In support of the relief requested herein,

1

Plaintiff alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys:

## INTRODUCTORY STATEMENT

1.     This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").   This suit is brought pursuant to 29 U.S.C. § 1132(a), to secure disability benefits due to Plaintiff through an ERISA welfare benefits plan sponsored by BlueScope Steel and insured through a group insurance policy issued by Unum insuring the Plan.

2.     The Plaintiff seeks any and all benefits to which he may be entitled, should this Court determine he is "disabled" under the terms of the Plan. Such benefits include all other available long-term disability benefits; waiver of premium benefits under disability, life, accidental death and dismemberment or accident policies issued or administered by Unum; and any other benefits available through The Plan, including those managed, administered or underwritten by Unum.

3.     Plaintiff seeks benefits based on the conditions documented in his medical records and other information before Unum. Plaintiff's disabling conditions arise from a constellation of conditions that have grown over time as Plaintiff's health has continued to deteriorate since he became unable to continue working in

2019. These conditions include failed back syndrome, degenerative disc disease, lumbosacral radiculopathy, failed laminectomy/low back syndrome, chronic pain syndrome, arthritis, degenerative joint disease, lower extremity neuropathy, obesity, vertigo/balance problems, frequent falls hyperlipidemia, restless leg syndrome, and sleep disorder.

## JURISDICTION

4.      Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

5.      Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

6.      Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District, the breaches of duty alleged herein occurred in this District, and the Defendant may be found or reside in this District and, pursuant to 28 U.S.C. § 1391(b), in that the cause of action arose in this District.

## PARTIES

7.      As of the filing of this Complaint, Plaintiff Billy Jay Chamlee, Jr. is a resident citizen of Alabama and this District.

8.      Defendant Unum Group Corporation is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

9.      Defendant Unum Group Corporation is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

10.      One of Unum Group Corporation's designated agents for service of process is:

c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

11.      Unum Group Corporation is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

12.      Unum Group Corporation is an entity providing services to The Plan at issue.

13.      Unum Group Corporation is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

14.      Defendant Unum Life Insurance Company of America is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

4

15.     Unum Life Insurance Company of America is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

16.     One of Unum Life Insurance Company of America's designated agents for service of process is:

>    Corporation Service Company, Inc.
>    641 South Lawrence Street
>    Montgomery, AL 36104

17.     Unum Life Insurance Company of America is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

18.     Unum Life Insurance Company of America is an entity providing services to The Plan at issue.

19.     Unum Life Insurance Company of America is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

20.     Unum Life Insurance Company of America contracted with, or presently has a contract, for services with Defendant Unum Group Corporation where Unum Group Corporation performs administrative functions for the Plan.

21.     Unum Life Insurance Company of America relies on employees provided through Unum Group Corporation for administrative functions for the Plan at issue.

22.    Group Insurance Plan of BlueScope Steel North America ("The Plan") is an "employee welfare benefit plan" as defined within 29 U.S.C. § 1001, et. seq., and may be served with process by serving:   BlueScope Steel North America Corporation, 1540 Genessee Street, Kansas City, MO 64102-1069.

## THE PLAN

23.    Upon information and belief, The Plan at issue was funded, at least in part, by a long-term disability insurance policy sold by Unum Life Insurance Company of America, the company which also underwrote the policy.

24.    This long-term disability policy was purchased by Plaintiff's employer for the purpose of conferring a benefit upon Plaintiff and other employees.

25.    As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under The Plan as that term is used in 29 U.S.C. § 1132.

26.    Under the terms of The Plan providing for disability benefits, Plaintiff is "disabled" as defined by The Plan.

27.    On information and belief, although the Plan purports to confer discretion to Unum Life Insurance Company of America, the employees that administered Plaintiff's claim either were employed by a different entity or acted under the direction or control of Unum Group Corporation pursuant to a general

6

services agreement, notwithstanding them having presented themselves to Plaintiff as employees of Unum Life Insurance Company of America.

## UNUM'S LIABILITY

28.     Plaintiff's "Regular Occupation" (as the Plan uses that term) before he became disabled was that of a "Manufacturing Engineer" for BlueScope Steel, a steel company that manufactures structural elements for large buildings.

29.     This occupation as it is performed at BlueScope's worldwide manufacturing facilities involves walking or standing for up to two-thirds of each workday and the ability to lift or carry up to 50 lbs up to one-third of each workday.

30.     There are also other aspects of mobility involved, such as the ability to stoop, kneel, crouch or climb stairs.   Most of this work involves supporting production in the plant and either proactively or reactively reducing or eliminating equipment downtime and increasing efficiency of plan operations.

31.     There is "frequent" repetitive motion involved, often in difficult or dangerous environments.

32.     The job is also mentally demanding with deadlines that must be met and many tasks or problems each day that must be prioritized and timely resolved.

33.     Although Plaintiff's job was called "manufacturing engineer," he was far more involved in the production side of the plant's operations than his title suggested through his constant work on and with plant machinery.   Plaintiff was

responsible, for example, for maintaining and installing plant machinery, a task he frequently had to perform.  This would involve work on heavy equipment for BlueScope facilities in Rainsville and elsewhere.  He was expected to walk the plant floor on a constant basis to patrol for problems with plant equipment or monitor progress on different jobs.

34.    An independent vocational review of Plaintiff's occupation based on BlueScope's job description and other information shows Plaintiff's occupation to be analogous to that of a "Heavy Equipment Mechanic at times."

35.    This is rated as a medium exertion occupation with physical demand characteristics that include exerting 20 to 50 pounds of force occasionally, or 10 to 25 pounds of force frequently, or greater than negligible up to 10 pounds of force constantly to move objects.  Routinely having to join in the work itself, he really worked as a heavy mechanic with supervisory and reporting responsibilities added to it, not the other way around.

36.    While engaged in this kind of work, Plaintiff has had to deal with the effects of a number of medical issues through the years, including non-Hodgkin's lymphoma at one point, which resulted in him having a splenectomy and many surgeries since then, including back surgery several years ago.

37.    In the summer of 2019, Plaintiff injured his back while picking up a package at his home.

38.   This injury exacerbated Plaintiff already-nagging history of spinal problems, which included surgery in 2012.

39.   One of Plaintiff's primary over-arching issues is his diagnosis for Failed Back Syndrome" ("FBS").   FBS is defined by the *International Association for the Study of Pain* as back pain, with or without referred or radiating pain, that is of unknown origin and persists or begins after surgical procedures are performed to treat lumbar degenerative disc problems.

40.   In addition to the suffering and disability that post-back surgery syndrome may inflict on patients, its impact on society is considerable.   Compared with other models of chronic pain, FBS patients with neuropathic pain experience intense levels of pain, lower quality of life, greater disability and higher rates of unemployment. This type of chronic pain is debilitating and often resistant to pharmacological, rehabilitational, psychotherapeutic and surgical treatments.

41.   There are many possible reasons as to why back surgery does not produce the desired results. One of the most common causes is damage to the spinal nerve root. This damage may not have been caused by the surgery itself, but the procedure did not help it recover from the trauma it previously experienced.

42.   Another possible cause is the formation of scar tissue as the body tries to heal itself after surgery. There is also a chance that the body can have a negative reaction to the structural changes made to the spine, this is usually the case in a failed

spinal fusion procedure. Whatever the cause of Plaintiff's FBS may be, it is a clear part of his medical history that results in his inability to continue working full time beyond November 5, 2019.

43.    Plaintiff's history leading up to that date, including treatment for his back, goes back as early as 2012. A November 2012 record from Dr. Ruiz shows that Plaintiff has suffered from pain in his back for much of his life, and that the pain since had steadily worsened to the point that it impacted his legs.

44.    Films at that time showed "spondylolisthesis at L5-S1 with modic changes at endplate and a ragged appearance of the disk space."

45.    His S1 nerve was also compromised, so he required, and underwent, surgical intervention that resulted in hardware being installed in his back.

46.    Plaintiff had a post-operative diagnosis for degenerative disc disease, L5, with bilateral stenosis and active bilateral S1 radiculopathies.

47.    Plaintiff's more recent records beginning in 2019 show a "fast-forward" where things have become progressively worse since that spinal fusion surgery.

48.    A July 31, 2019 record from Dr. Smith includes an exam and imaging study showing hyperesthesia in the L5 dermatome and multilevel disc space narrowing.  His report of Plaintiff's condition was as follows:

**HPI:** This is a 53 year old male who comes in for a chief complaint of Acute Low Back Pain, involving the lumbar spine. This occurs in the context of bent over to pick up some cat food and cat litter. Pain radiated down right buttock. Have had increase of pain since. . The pain has been present for 1 week. The lumbar spine pain is aggravated by exercise, lifting objects, bending over, and sitting for long period and is constant and worse during activity. The lumbar spine pain is described as radiating, aching, associated with shooting sensations, sharp, associated with stiffness, worse with ambulation, burning, and worse with flexion and associated with pain in the right posterior thigh and weakness in right lower extremity. The lumbar spine pain is 8 out of 10 currently. The leg pain is 4 out of ten. He has the following pertinent history: recurrent back pain, prior history of spine surgery, and osteoarthritis. He reports difficulty sitting, difficulty walking, difficulty standing, and constant functional limitations. He has been treated with medications (Ultram and NSAIDs, ibuprofen) and heat.

49.     An MRI taken soon after that appointment revealed further "postsurgical and degenerative changes at L5-S1…" and "mild lumbar spondylosis." This coincided with a back injury around that time.

50.     After this imaging, Plaintiff reported a steady increase in pain and decrease in his ability to engage consistently in physical activities. He continued to undergo pain management and reported to his doctors that he often suffered falls because his legs would give out and he would routinely lose his balance.

51.     Assessments provided to Unum over this time in connection with Plaintiff's short-term disability claim administration showed Plaintiff to lack the abilities to be unable to lift safely more than 5 pounds, to be unable to engage in any physical labor, and to be restricted from pushing, pulling, climbing, standing, crouching, bending, stooping and walking.

52.     Dr. Decker confirmed that Plaintiff was "totally and permanently disabled for life" due to these issues.

53.     In one assessment, Dr. Decker wrote the following:

11

**Restrictions**                    Begin Date 11-19-209    End Date _lifetime_
(Describe what the patient should not do):

_patient should not lift more than 5 lbs, patient should not do any_
_physical labor to include pushing, pulling, climbing, standing, heavy-lifting_
_crouching, bending, crouching, reaching, stooping, standing, walking_

**Limitations**                    Begin Date 11-19-209    End Date _lifetime_
(Describe what the patient cannot do):

_patient is disabled for life. patient is unable to return_
_to work. patient cannot do any pushing pulling, crouching_
_climbing bending, atrophy, heavy lifting - should not lift more than_
_5 lbs. Changing positions_

If you wish, you may respond directly on this letter. Please sign and date in the space
provided below and return this completed questionnaire with the requested items above.

_____    02/13/2020
Signature                           Date

---

54.     Dr. Decker also assessed Plaintiff as being unable to sustain a seated

position consistently or engage in repetitive activity like operating a keyboard.

55.     Importantly, Unum's reviewing nurse during the administration of

Plaintiff's STD claim **agreed**, as reflected in the following claim note:

```
Clinical Analysis: R&LS of no lifting >5#, no physical labor to include pushing,
pulling, climbing, standing, heavy lifting, crouching, bending, reaching, stompi:
walking are medically supported thru 4-6 weeks after 2/11/20 given EE's ongoing
dizzy spells and balance problem, had a recent fall on 2/9/20, has chronic LBP w
leg weakness, has a h/o L4-L5 fusion in 2012, has decreased ROM and muscle spasm.
on the spine, taking pain meds, struggling w/ ADLs, and referred to Spine and
Neuro.

Recommendation: If no RTW, would need updated OVN w/ R&Ls from Neuro and detaile·
functional call for further review.

ICD Code: Update primary code M54.16 secondary code G89.4

CC Signature: Kristal Joy A. Cayas, RN 2/19/20


Recommend: App 4-6 wks from 2/11ov.
```

56.     Unum thereafter approved Plaintiff's STD benefit for its full term.

57.     As his short-term disability benefit drew to a close, Plaintiff instituted a claim for long-term disability benefits available through the group policy issued and administered by Unum.

58.     Despite Unum having approved Plaintiff's short-term benefit in full and finding him to be disabled under that plan's terms, Unum denied Plaintiff's long-term benefit and found him *not* to be disabled under the LTD plan.

59.     The only difference in circumstances between the two decisions and underlying claim process is that the STD plan benefit, though administered by Unum, is funded entirely by BlueScope, while the LTD Plan benefit, also administered by Unum, is funded by *Unum*.

60.     In other words, Unum found Plaintiff's medical evidence to support disability benefits when BlueScope was paying, but not for LTD when responsibility

for payment changed to Unum.

61.     Plaintiff's records since his approval for STD benefits show no change, let alone substantial medical improvement, in his conditions. They show he continues to experience "[m]ild to severe pain that is present to some degree for long periods of time."

62.     In fact, this past July 2020, Plaintiff, who as indicated above previously had non-Hodgkins lymphoma, saw Dr. Kevin Windsor for evaluation for a possible myeloproliferative disorder because of abnormal labs that revealed an elevated platelet count. After Dr. Windsor completed the evaluation, he concluded that the elevated platelet count was caused by Mr. Chamlee's combination of having chronic pain and a prior splenectomy.  As Dr. Windsor noted, this is "not uncommon in splenectomized patients…."

63.     Despite there being no change in Plaintiff's conditions, Unum announced its contradictory and self-serving determination on Plaintiff's LTD claim in its letter dated May 19, 2020, where it informed Plaintiff that it was denying and closing his LTD claim because it had found its own  "on-site physician" opinion based solely on a review of Plaintiff's medical documentation was more reliable than the professional clinical observations and conclusions of Plaintiff's physicians who had interacted with, observed, evaluated and assessed Plaintiff in person.

64.     Unum also incorrectly had characterized Plaintiff's occupation as being

a "light" physical-demand occupation.

65.     After learning of Unum's denial of is claim, Plaintiff, through counsel, submitted to an Independent Medical Examination where he was evaluated by means of direct observation for the impact of his constant and intense pain on his functionality.

66.     In this evaluation, Plaintiff was observed to have "major difficulty with ambulation" due to outward indications of pain in his back and knees, in addition to excess weight gain. Plaintiff was also evaluated as follows:

> He has an unsteady and plodding gait and exhibits signs of increased pain. He is also unable to sit for more than 15 minutes at a time without needing to rise and adjust his position. While sitting for that period, I observed him constantly shifting positions and exhibiting other pain behaviors.  He confirmed his level of pain to be significant, and based on my observations of him, his reports of pain booth as to existence and intensity are consistent with his behaviors and his medical records. He becomes short of breath with minimal exertion, such as attempting unsuccessfully to squat. He performs lateral flexion at his waist to 15 degrees bilaterally with much pain, Forward flexion is limited by pain and dyspnea. He required a rest break every two minutes while attempting to perform various maneuvers. His standing tolerance is less than 3 minutes.  He is a fall risk because of his weakness, poor equilibrium and morbid obesity.

67.     The independent medical examiner, who also reviewed Plaintiff's medical records, found the assessments and clinical opinions of Plaintiff's primary treating physician Dr. Decker to be clinically supported.

68.    Other observations during the examination included that Plaintiff's difficulties impacted his daily life and reasonably would be expected to affect Plaintiff's attention, concentration and higher ordered executive function due to his pain levels which would steadily increase throughout the day whether sitting or standing.

69.    The examiner also concluded:

It is to be reasonably expected from a professional medical perspective that the impact of pain on these could worsen over the course of a typical workday and workweek, such that this patient would be reasonably expected to incur an excessive number of absences that no workplace could reasonably accommodate. I find substantial support for Dr. Decker's conclusions both in this patient's records and based on my examination.

70.    Finally, as an aside, the evaluator noted Plaintiff's medical history which included a splenectomy and other events that place him in an immune-compromised state at heightened risk of severe infection for COVID-19.

71.    Based on Plaintiff's demonstrated functional limitations, an independent vocational assessment was then obtained.

72.    This independent assessment found Plaintiff to be unable to perform not just a medium duty or light duty occupation, but any fulltime work within the national economy.  That conclusion was as follows:

Based upon the information reviewed including the evaluee's Declaration, it is obvious this individual had a very strong work ethic and work history and I do believe his statement on page 4: "I loved my job and the people I worked with; if I could return to it, I would do so, but I can't". He did attempt to return to work but was unable to continue due to his conditions. Dr. Decker's restrictions and limitations describe an individual who is capable of less than sedentary work in that the duration of Mr. Chamlee's abilities do not equate to an 8 hour workday. His occupation of Manufacturing Engineer is listed as Light in the DOT; however, I opine he actually performed the occupation at the Medium level of exertion. Given the medical evidence, he is certainly not capable of returning to his past job, even if performed at the Light level of exertion. Dr. Smith, Dr. Decker, and now Dr. Ross all opine Mr. Chamlee is totally vocationally disabled. After reviewing the medical evidence in this case, I must agree that this evaluee is unable to return to work at any level and remains 100% disabled.

73.    Plaintiff, through counsel, submitted these independent evaluations, his sworn statement, and other information with his appeal package sent to Unum via facsimile and U.S certified mail on September 3, 2020.

74.    Transmission of the appeal via facsimile to Unum was successful on that same date (September 3), while the certified return receipt confirms Unum's receipt of the submission sent via certified mail on September 14, 2020.

75.    Unum separately confirmed its receipt of Plaintiff's appeal in a letter dated September 8, 2020 which also identified the appeals team to whom Plaintiff's appeal had since been assigned.

76.    In a letter dated September 30, 2020, Unum's appeals specialist Mr. Kurt Phillips provided an update on his team's review of Plaintiff's appeal, stating that it was under review by his team's "medical consultant."

77.    Plaintiff acknowledged and responded to the letter the following day and stated his expectation that that the appeal would be timely decided within the

45-day timeframe provided under Department of Labor regulations and Plan terms.

78.    In a letter dated October 7, 2020, Mr. Phillips sent Plaintiff the report from the review his team's medical consultant had completed inviting Plaintiff's response pursuant to relevant regulations requiring that opportunity to be provided. The letter provided a deadline of October 22nd for that response.

79.    Plaintiff, through counsel, provided that response on October 22, or within the deadline provided.

80.    The day after it received Plaintiff's response to it review, Mr. Phillips sent a letter informing Plaintiff that Unum sought an extension of its deadline for rendering a decision through December 6, 2020.  The sole reason given for the invocation of the extension was the indication that it was needed to allow Plaintiff sufficient time to respond to its medical review – an entirely false premise since it already had Plaintiff's response in hand the day before.

81.    One week later, Unum's real reason for the extension became apparent when on October 30, 2020, Mr. Phillips on Unum's behalf sent yet *another* review to Plaintiff, this one replying to Plaintiff's October 22, 2020 response.

82.    That same day, Plaintiff sent a letter back to Mr. Phillips noting his team's unreasonable interpretation of its obligations under the Plan and Department of Labor regulations; that letter read in its entirety as follows:

Dear Mr. Phillips:

This is to knowledge receipt of the letter dated October 23, 2020, which I enclose bates numbered 1686 for identification in Mr. Chamlee's claim record. Your request for an extension is noted; however, because no grounds are given for why it is necessary, we are unable to agree to it. The regulations do not contemplate either an extension or tolling for the provision for a new review. Rather, the new review is supposed to be accomplished in time for that response to occur and for a timely response to be issued.

Mr. Chamblee's appeal was submitted on September 3rd, 2020 and was received by Unum that same day. Therefore, Unum's time for rendering any claim decision extends 45 days from that date, or until October 19th, 2020, which is first business day following October 18th. While I am understanding of the need for additional time in light of our response having been sent to you on October 22nd, it is troubling that Unum keeps hitting the ball into the air by issuing repeated rebuttals to our responses to its claims decision as if it has lashed itself to the wheel to kill off this claim. The issuance of yet another new review received earlier today does not toll this time further. Therefore, at this point, we consider your time for having decided this claim has having been deemed denied by operation of law. The additional bite at the apple from your OSP will be treated as a post hoc rationalization at this point, and we will respond accordingly. That response should not be taken as a waiver of the foregoing position.

Like other LTD claimants, the loss of this insurance benefit has inflicted significant financial hardship on your insured. Unnecessary delay in your decision making because your OSP

[page break]

cannot put together a workproduct your company feels comfortable with is not grounds for extending that timeframe. It is unfair to your claimants and contrary to Department of Labor regulations. It is because of these interests we must enforce those rules as they are written.

83.    In a letter dated November 12, 2020, Plaintiff again observed Unum's lack of compliance with its regulatory and Plan deadline. Noting Unum had already denied the claim by operation of law by failing to issue a timely written decision, Plaintiff sent commentary on the revised review Unum's medical resource had provided as a post hoc rationalization hoping the claim could be resolved without having to resort to litigation.

84.    Unum has not revisited its denial.

85.    Documents in Plaintiff's claim record thus far identified by Plaintiff and known to him establish numerous breaches and errors committed by Unum while administering Plaintiff's claim, including:

(a)    The targeting of Plaintiff's claim for denial because ERISA governs;

(b)    The failure by Unum to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(c)    The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of his claim;

(d)    Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all of his claim;

(e)    Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(f)    Failing to accord any weight to Plaintiff's medical providers who personally examined the Plaintiff on a regular basis, and instead

20

relying only on nurse reviewers who are unqualified to overrule such physicians;

(g) Failing to adhere to the terms of the Plan and Department of Labor regulations, such as those governing the review of adverse benefit determinations, when a decision must be made;

(h) Purposefully limiting and curtailing the review of its medical consultants and otherwise improperly exerting influence on them to opine against payment of benefits;

(i) Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff;

(j) Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how her conditions impacted one another;

(k) Failing to give proper consideration or weight to Plaintiff's SSDI award and disability finding, especially as to the award's vocational component finding her to be unable to perform any gainful activity throughout the national economy; and

(l) Unreasonably and arbitrarily overruling *its own* prior determinations that Plaintiff was permanently disabled without there being medical evidence of substantial medical improvement in Plaintiff's conditions.

86.    As set forth above regarding Unum's fiduciary breaches, Unum's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

87.    Employees who were responsible for the administration of Plaintiff's claim for benefits are eligible to receive bonuses and awards based at least in part on company profitability.

88.    Further, employees who had supervisory involvement and authority over Plaintiff's claims process participate in Unum Group Corporation's management incentive compensation program.

89.    Employees involved in the administration of Plaintiff's claim also participate in Unum Group Corporation's performance recognition program.

90.    To receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

91.    Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

92.    Unum's history of abusive claims practices reaches back for many years and includes documented policies of instructing, encouraging or incentivizing employees responsible for claims administration to deny claims, especially when that claim is found likely to be subject to ERISA.

93.   This strategy finds its inception in what has become known as the LeBeouf Report.

94.   The LeBeouf Report and internal documents relating to the same established a strategic approach that included an "ERISA Task Force" created by Unum for the implementation of standardized claims practices that encouraged employees to consider the applicability of ERISA during the administrative process and then to target such claims for potential denial to "take advantage of ERISA protection."

95.   In an October 2, 1995 memorandum, Unum management-level employee Jeff McCall assessed the opportunities afforded by ERISA's application to aggressive handling of claims as follows:

> The advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of the benefit in question, and claims administrators may receive a deferential standard of review.  The economic impact on Provident from having policies covered by ERISA could be significant. As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate.  If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

> The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan.  If the employer pays the premium, the policy would usually, but not always, be considered to be governed by ERISA.  Salary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA.  While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA

applicability may influence our course of action.

Memorandum of Jeff McCall (a copy of the foregoing memorandum is included in Plaintiff's ERISA administrative record).

96.    Between 2002 and 2004, Unum was subjected to investigation by several state departments of insurance.  The announced purpose of that investigation was "to determine if the disability income claims handling practices of [Unum] reflected systemic 'unfair claim settlement practices'" in violation of various state insurance laws.

97.    Upon completion of the investigation, examiners found many abuses, including unfair construction of evidence and evidentiary or contractual requirements for proving entitlement to benefits.  (A copy of the foregoing document is included in Plaintiff's ERISA administrative record).

98.    After completion of this multi-state investigation in November 2004, Unum entered into a Regulatory Settlement Agreement ("RSA") whose terms required it to pay a substantial fine and to amend its claims practices.

99.    Unum, however, did not faithfully comply with the terms of the agreement, and instead engaged in an effort to better camouflage its pre-RSA claims practices.

100.   Not long after its execution of the RSA, Unum instructed its employees to continue to decide claims as they had done previously, notwithstanding Unum's forthcoming revision of its claims procedures to satisfy any future inspectors.

101.   As part of this resumption of its pre-RSA activities, Unum continued its incentivization programs aimed at closing claims and obtaining "recoveries" for Unum in the form of released reserves.

102.   Unum employees at the claim administration level continued to take part in a company bonus system and award program tied to company profitability.

103.   Unum employees at the claims level also continued to be evaluated on a regular basis for their efforts to achieve goals connected to the enhancement of corporate profits.

104.   As set forth above, to receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

105.   Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

106.   Unum's "Manager Toolkit" shows metrics included within these criteria involve claim closure or termination numbers, liability acceptance rates, and claim reopen rates.

107.   These values, individually or in the aggregate, may influence the award

25

of performance compensation or consideration of corporate advancement opportunities.

108.   Unum even explicitly directs its management employees to filter information to those reporting to them so their interests likewise justify with those of the overall company.

109.   As Unum's documents make clear, the more an individual or unit is perceived as contributing to the meeting of Unum's financial goals, the greater their share of the bonus pool.

110.   Unum also actively tracks the pursuit of goals for closing claims or recovering or conserving reserves on a regular basis and consistent basis through Weekly Tracking Sheets.

111.   According to Unum's claims procedures pertaining to IDI milestone reviews, these goal documents are made available to the claim directors, the very individuals charged with deciding whether claims will be approved or denied and whether open claims will be terminated.

112.   Unum also uses a "balanced business scorecard" approach at the director level to ensure claims personnel remain informed throughout the year on whether the company is meeting the financial goals necessary for the availability of bonus or incentive compensation.

113.    These scorecards are among those documents evidencing the continuation of Unum's earlier pre-RSA claims practices; other Unum documents have also specifically referenced goals, expectations, projections and targets for closures.

114.    This active conflict of interest under which Unum employees operate further calls into question the credibility of Unum's claims personnel and reviewers, such that no deference to the decision made here should be accorded.

115.    Unum considered the applicability of ERISA before making its decision.  This presents an additional reason for application of a *de novo* standard to their claim decision, and to excuse the Plaintiff from further utilization of Unum's claim process.

116.    Unum did not provide Plaintiff with a meaningful opportunity for a full and fair review of her claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

117.    Unum's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

118.    Plaintiff has exhausted all Plan remedies even though Unum's failure to adhere to Plan terms or ERISA requirements and regulations did not require it. As such, this case is ripe for judicial review.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Billy Jay Chamlee, Jr. respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.    For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plans and Policies identified in this Complaint, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.    For a judgment against Unum and the Plan awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.    For an order requiring Unum and the Plan to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

d.    Such other relief as may be deemed just and proper.

Respectfully submitted,

David P. Martin
(ASB-3500-M68D)
M. Clayborn Williams
(ASB-9101-A43M)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com
david@erisacase.com

**Plaintiff's Address:**

Billy Jay Chamlee, Jr.
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

Unum Life Insurance Company of America
c/o Corporation Service Company
641 South Lawrence Street
Montgomery, AL 36104

BlueScope Steel North America Corporation
1540 Genessee Street
Kansas City, MO 64102-1069

*Defendants to be Served by Notice of Lawsuit and Request for Waiver of Service*

29